**SEALED**

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2021 NOV -1  AM 11: 58

OFFICE OF THE CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **PAMELA BENNE and TONI HYNES,** c/o Cornerstone Law Firm 5821 NW 72nd Ter. Kansas City, MO 64151<br><br>Relators,<br><br>and<br><br>**PAMELA BENNE and TONI HYNES,** c/o Cornerstone Law Firm 5821 NW 72nd Ter. Kansas City, MO 64151<br><br>Plaintiffs,<br><br>v.<br><br>**QUICK MED CLAIMS, LLC,** a Delaware Limited Liability Company, *Resident Agent:* URS AGENTS INC. 5601 S. 59TH STREET, SUITE C LINCOLN, NE 68516<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. $8:21cv423$

**FILED IN CAMERA AND UNDER SEAL**

**REQUEST FOR JURY TRIAL**

**RECEIVED**

NOV 0 1 2021

CLERK
U.S. DISTRICT COURT

## COMPLAINT FOR DAMAGES

COMES NOW the United States of America, by and through qui tam Relators/Plaintiffs Pamela Benne ("Benne") and Toni Hynes ("Hynes") (collectively "Relators"), and for its cause of action against Quick Med Claims, LLC ("QMC"), alleges as follows:

### Preliminary Statement

1.     This is an action to recover damages and civil penalties on behalf of the United States of America for violations of 31 U.S.C. §§ 3729 *et seq.*, as amended ("False Claims Act").

2.      Under the False Claims Act, it is unlawful for any person to knowingly present or cause to be presented to the United States a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

3.      Under the False Claims Act, it is unlawful for any person to knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

4.      Under the False Claims Act, it is unlawful for any person to conspire to commit a violation of § 3729(a)(1)(A)-(B).

5.      Any person who violates the False Claims Act is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000 for each such claim, plus three times the amount of damages sustained by the United States because of the false claim or claims.

6.      Pursuant to 31 U.S.C. § 3730, Relators seek to recover damages arising from Defendant's violations of the False Claims Act, namely for damages incurred from the false or fraudulent claims submitted or caused to be submitted by Defendant to government insurance programs, including but not limited to Medicare, Medicaid, and the Veterans Administration (VA").

### Parties and Jurisdiction

7.      Relators are citizens of the United States and the State of Nebraska, both domiciled in Washington County, Nebraska.

8.      Relators are former employees of Defendant QMC.

9.      Defendant QMC is and was at all relevant times a limited liability company active and in good standing in the state of Nebraska, with its principal place of business at 1400 Lebanon Church Rd., West Mifflin, PA 15236.

10.    QMC provides emergency medical transportation billing, reimbursement and financial management services, and other professional services to ambulance service companies throughout the nation.

11.    Since August 2019, QMC has maintained a place of business in Omaha, Nebraska.

12.    QMC began operating in Nebraska after purchasing EMS Medical Services, Inc. ("EMS") in August 2019.

13.    Upon information and belief, QMC assumed EMS's liabilities upon purchase of the company.

14.    This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 because this cause of action arises under the laws of the United States, and because Plaintiff is commencing suit on behalf of the United States.

15.    This court has jurisdiction over the parties to this action pursuant to 31 U.S.C. § 3732 because Defendant transacts business in this judicial district.

16.    Venue is proper in this court pursuant to 31 U.S.C. § 3732 because Defendant transacts business in this judicial district.

17.    This suit is not based upon prior public disclosures of substantially the same allegations or transactions as defined by 31 U.S.C. § 3730(e)(4)(A).

18.    To the extent there has been a public disclosure of these allegations unknown to the Relators, Relators are the "original source" of the foregoing information as defined by 31 U.S.C. § 3730(e)(4)(B).

19.    Relators' knowledge of the allegations and transactions herein is derived from their own efforts and labor and not based on publicly disclosed information.

20.     The statute of limitations on a False Claims Act case extends back six years from the original filing of this litigation. *See* 31 U.S.C. § 3731(b)(1).

### Background

***Medicare Reimbursement for Non-Emergent Ambulance Services:***

21.     Under certain conditions, Medicare pays for non-emergency ambulance services rendered to its beneficiaries.

22.     Relevant to this case, Medicare-covered ambulance services are paid as a separately billed services in which the entity furnishing the ambulance service bills Part B of the program.

23.     Under its various contracts with ambulance service companies, QMC facilitates the billing processes necessary for these companies to receive Medicare reimbursement for non-emergency transports rendered by the companies to beneficiaries.

24.     For Medicare to provide reimbursement for non-emergency ambulance services, the services rendered must have been medically necessary, i.e., the patient's medical condition at the time of transport was such that other means of transportation would jeopardize his or her health. *See* 42 C.F.R. § 410.10 *et seq.*

25.     To receive payment for services rendered, Medicare requires service suppliers to submit claim forms ("CMS 1500") in which the provider furnishes and certifies the truthfulness of certain information on the form, including the identity of the patient, the provider number, the procedure code number, and a brief narrative explaining the diagnosis and the medical necessity for the service rendered.

26.     In submitting the claim to Medicare for payment, the submitting provider certifies that the services in question were medically necessary for the health of the patient.

27.     In submitting the claim for payment, the ambulance service supplier certifies that the services in question were medically indicated and necessary for the health of the patient.

28.     Aside from the claim form itself, ambulance service suppliers are not required to submit additional documentation to Medicare for billing purposes, but documentation such as a Patient Care Report ("PCR") must be kept on file and available upon request by Medicare as evidence of the medical necessity of the services. 42 C.F.R. § 410.40.

29.     A medical provider is permitted to forgive a Medicare patient's obligation to pay copays and deductibles.

30.     However, such forgiveness is only permitted after the provider performs a case-by-case determination that either collection of the obligation would cause undue hardship to the patient or would otherwise be impracticable.

31.     Routine waiver of patient obligations without a hardship analysis is a violation of the Anti-Kickback Statute. 42 U.S.C. § 1320a–7b(b).

32.     Medicare is secondary to liability insurance, workers compensation insurance, or no-fault insurance. 42 C.F.R. § 411.20(a)(2).

33.     In other words, if it can reasonably be expected that liability insurance, workers compensation insurance, or no-fault insurance is obligated for a medical payment, providers are obligated to make a reasonable effort to obtain payment from such "primary payors" before submitting a claim to Medicare.

34.     Providers are generally permitted to submit claims to Medicare if one hundred twenty (120) days pass without payment from a primary payor after reasonable efforts.

35.     A provider who becomes aware it has received payment from Medicare to which it is not entitled must notify and reimburse Medicare within sixty (60) days of becoming aware of such overpayment.

36.     The obligation to refund Medicare can be satisfied either by direct repayment or by offset by Medicare of future reimbursements.

*Patient Care Reports*

37.     For non-emergent ambulance transports, QMC's standard practice directs ambulance personnel to complete a PCR.

38.     The PCR's purpose is, in part, to describe in detail the medical condition of the patient and the services he or she received.

39.     Information sought on the PCR includes, but is not limited to, the mileage of the transport, the patient's signs and symptoms, and the level of service provided.

40.     The purpose of requesting the signs and symptoms is to assist the QMC billing specialist determine whether the transport was medically necessary and assign appropriate ICD-10 code for billing.

41.     QMC also requests the mileage for the transport because that information is generally required by Medicare for reimbursement.

42.     Those reviewing claims submitted to Medicare are authorized to enter a mileage of 0.1 miles on CMS 1500s when a claim is submitted with the mileage otherwise left blank, though the entry of 0.1 miles was rarely done, and claim forms missing mileages were nearly uniformly rejected.

43.     Once complete, the PCR is sent to a QMC billing specialist, who reviews the PCR and determines whether the services rendered were medically necessary based on the information

provided and if all other required information is included, which in turn dictates whether the claim should be submitted to Medicare for reimbursement.

44.     When submitting a claim, suppliers, including QMC, must ensure that the PCR is either be signed by the patient or the patient's authorized representative.

45.     Although the CMS Form 1500 provides an place for a patient to sign to indicate authorization to submit claims to Medicare, generally, due to the ubiquity of electronic claim submission, instead of having the patient or authorized representative sign the actual CMS Form 1500, a supplier may indicate, if true, that the patient or authorized representative's signature is on file.

46.     Prior to the purchase of EMS by QMC, EMS's billing system was calibrated to automatically fill the patient/authorized representative signature field of the CMS 1500 with the phrase "Signature on File".

47.     A supplier or ambulance provider must have the patient's or authorized representative's signature on file before submitting their claim to Medicare.

48.     An ambulance provider may serve as an authorized representative for signature purposes, but only in certain circumstances.

49.     Specifically, an ambulance provider may be an authorized representative if no other eligible potential authorized representative is available or willing to sign, and if specific documentation is maintained.

### General Allegations Common to All Counts

50.     Benne began working for Defendant QMC in August 2019, when it purchased EMS, where Benne's duties included but were not limited to billing compliance for nearly nine years, ultimately becoming Director of Compliance until the purchase.

51.     Although Benne was given the job title of Director of Compliance at EMS, she did not have authority over the department and instead was required to obtain authorization from her supervisor ("L.V.").

52.     Hynes served as a contractor with EMS until it was purchased by QMC, at which time she was hired as an Operations Generalist, performing, among other duties, billing compliance in both roles.

53.     The billing departments at both EMS and QMC submitted claims for reimbursement to government insurance programs, including but not limited to Medicare, Medicaid, and the VA, for nonemergent ambulance services performed by their clients.

54.     Part of both Benne's and Hynes's job duties were to audit claims submitted to Medicare and other government insurance programs to ensure that they complied with government regulations and guidelines, as well as claims submitted to private insurance.

55.     Between September 11, 2019, and January 24, 2020, Relators audited approximately 167 claims for reimbursement by QMC, 88 of which were submitted to Medicare, the VA, or one of several Medicaid programs.

***Submission of Claims for Transports that Were Not Medically Necessary***

56.     Of the eighty-eight (88) claims submitted to public insurance programs, Relators identified twenty-five (25) that contained ICD-10 codes that did not accurately reflect the signs and symptoms described on the corresponding PCR.

57.     Examples of this practice include, but are not limited to:

    a.  a claim submitted to Medicare on October 17, 2019, for a transport occurring on September 11, 2019, the PCR for which reflected dizziness, but the claim contained the wrong diagnosis code;

    b.  claims submitted on October 3, 2019, October 25, 2019, October 3, 2019, September 13, 2019, and October 8, 2019, for transports occurring on September 4, 2019, July 9, 2019, August 28, 2019, September 8, 2019, September 5, 2019, respectively, reflected improper codes for various breathing issues; and

    c.  a claim submitted Medicare on November 13, 2019, for a transport on November 1, 2019, which included a diagnosis of hemiplegia, when the correct codes pursuant to the PCR were weakness and difficulty walking.

58.    Upon information and belief, Relators allege that the aforementioned claims were all paid by Medicare.

59.    When relators noted the aforementioned claims reflected improperly coded breathing issues, one of the supervisors for Defendant QMC ("S.M.") sent an email to Relators' site lead ("M.M.") on December 9, 2019, indicating that she authorized the use of a wide variety of potential ICD-10 codes, even when one particular code would be more accurate.

***Missing Beneficiary Signatures***

60.    During their audit from September 11, 2019, and January 24, 2020, Relators identified eleven (11) claims that had been submitted to public insurance programs indicating "Signature on File" despite not having a patient signature on the corresponding PCR.

61.    Specifically, the claims for which the corresponding PCRs did not bear the patients signatures included but are not limited to:

    a.  A claim submitted to Medicare on September 24, 2019, for a transport on August 17, 2019;

    b.  A claim submitted to Medicare on September 13, 2019, for a transport on September 8, 2019;

    c. A claim submitted to Medicare on October 7, 2019, for a transport on September 9, 2019;

    d. A claim submitted to Medicare on October 28, 2019, for a transport on August 2, 2019; and

    e. A claim submitted to Medicare on October 4, 2019, for a transport on September 22, 2019.

62. Seven (7) of the aforementioned claims bore the signatures of the ambulance provider on the corresponding PCR.

63. However, QMC submitted those seven (7) claims without any record of whether the ambulance provider verified that no other eligible potential authorized representative is available or willing to sign.

64. Upon information and belief, Relators allege that the aforementioned claims were all paid by Medicare.

***Inaccurate Mileages on Claims***

65. M.M. was a billing supervisor for both QMC and EMS.

66. On January 20, 2020, M.M. indicated on a Zoom call with management for QMC that her standard instruction to billing employees was to enter 1.0 miles into the CMS 1500 when the mileage is omitted on the corresponding PCR.

67. The implication from M.M.'s statement was that this had been her practice not only since becoming employed with QMC, but also during her employment with EMS.

68. During their previously-described audit, Relators noted two claims, including one submitted to Medicare on October 17, 2019, for a transport on September 8, 2019, for which the corresponding PCR was missing the mileage of the transport.

69.     Upon information and belief, Relators allege that the aforementioned claims were all paid by Medicare.

*Improper Waiver of Patient Responsibility*

70.     Prior to the purchase of EMS by QMC, L.V. mandated that EMS should send two invoices to patients to collect unpaid copays or deductibles.

71.     If after two invoices, the patient's obligation went unpaid, L.V. mandated that the obligation should be waived.

72.     L.V. neither conducted nor delegated any type of hardship analysis in such situations.

73.     Relators' understanding is that all of EMS's billing practices, including this practice of waiving patient obligations without a hardship analysis, were maintained at QMC after the purchase of EMS until specific clients were migrated onto QMC's billing platform.

*Disregard of Primary Payor*

74.     During Relators documented audit period, Relators identified two instances in which claims were submitted to Medicare within one month of the service provided, far less than the 120 days a biller must afford a liability insurer to pay or reject a claim before submitting to Medicare.

75.     Specifically, in one instance, the patient was involved in a motor vehicle collision and transported on September 4, 2019.

76.     That claim was submitted to Medicare on September 25, 2019.

77.     Relators had no indication that a claim was submitted to any liability insurance before it was submitted to Medicare.

78.   In another instance, a patient was injured at work in what appeared to potentially be a work-related injury.

79.   That patient was transported on August 29, 2019.

80.   That claim was submitted to Medicare on September 13, 2019.

81.   Relators had no indication that a claim was submitted to any liability or workers compensation insurance before it was submitted to Medicare.

82.   Upon information and belief, Relators allege that the aforementioned claims were all paid by Medicare.

***Failure to Reimburse Overpayments***

83.   EMS maintained a file folder containing documentation for outstanding refunds owed to payors for overpayments.

84.   Most of the documents contained in the file folder were related to refunds owed due to overpayments received from Medicare.

85.   Relators do not recall seeing many—if any—documents being removed from this file folder, indicating that, despite having been identified by EMS, the overpayments from Medicare had not been reimbursed.

86.   On occasion, EMS would reach out to provider clients to obtain authorization to make direct repayment to Medicare for the overpayment.

87.   If a client did not respond or did not otherwise authorize direct repayment to Medicare for overpayments, rather than notify, or delegate notification to, Medicare to allow it the opportunity to offset overpayments from future reimbursements, M.M. would simply remove evidence of the overpayment from the client's balance in EMS's software.

88.     These practices were continued in the Omaha office of QMC after the purchase of EMS through the termination of Relators' employment

89.     During their audit in late 2019 and early 2020, Relators identified that overpayments were owed for many of the previously identified claims, including but not limited to:

      a.  the claim submitted on September 25, 2019, for the transport related to a motor vehicle collision, for which a liability insurance carrier was likely the primary payor under Medicare rules;

      b.  the claims submitted on September 9 and September 24, 2019, for which the corresponding PCRs bore neither the patient signatures, the authorized representative signatures, nor indication that the necessary conditions for accepting the transport providers' signatures applied; and

      c.  the claim submitted on September 13, 2019, for the transport seemingly related to a work-related accident, for which either a liability insurance or workers compensation insurance carrier was likely the primary payor under Medicare rules.

90.     Relators notified M.M. of these overpayments.

91.     Upon information and belief, Relators allege that the aforementioned overpayments were never reported to Medicare and no refund was ever submitted to Medicare.

***Retaliation***

92.     On or around January 24, 2020, M.M. instructed Relators to stop performing audits on claims submitted by QMC's employees despite that being a primary job duty for both.

93.     On March 2, 2020, Benne felt that she had no option other than to quit, in part because she felt like QMC was preventing her from doing her job.

94.    When Benne notified QMC that she was resigning her employment, M.M. instructed her to destroy any audit documentation in her possession.

95.    QMC terminated Hynes's employment on May 29, 2020.

**COUNT I**
**Violation of 31 U.S.C. § 3729(a)(1)(A)**
**Submitting False or Fraudulent Claims for Payment**

96.    Relators re-allege and incorporates herein by reference, as though fully set forth herein, all of the above numbered paragraphs.

97.    Defendant knowingly presented or caused to be submitted false or fraudulent claims to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim with ICD-10 codes that did not accurately reflect the signs and symptoms as described on the corresponding PCR.

98.    Defendant knowingly presented or caused to be submitted false or fraudulent claims to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim representing that the patient's or authorized representative's signature was on file without confirming the same.

99.    Defendant knowingly presented or caused to be submitted false or fraudulent claims to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim with a mileage entry of 1.0 miles despite no mileage having been entered on the corresponding PCR.

100.    Defendant knowingly presented or caused to be submitted false or fraudulent claims to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim after having regularly waived patient obligations to pay copays

or deductibles without establishing hardship or impracticability of collection in violation of the Anti-Kickback Statute.

101.    Defendant knowingly presented or caused to be submitted false or fraudulent claims to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim without making reasonable effort to first obtain payment from an appropriate liability insurance, workers compensation insurance, or no-fault insurance carrier.

102.    With respect to its fraudulent claims, Defendant had actual knowledge of such information, acted in deliberate ignorance of the truth or falsity of such information, or acted in reckless disregard of the truth or falsity of such information.

103.    As a result of its fraudulent acts, Defendant has interminably received reimbursements from government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, for services not otherwise reimbursable.

104.    To the extent any of the aforementioned conduct is attributable to EMS, QMC is liable for such conduct as EMS's successor-in-interest.

105.    Additionally, to the extent any of the aforementioned conduct is attributable to EMS, QMC has had knowledge of such conduct and failed to report and reimburse the government programs for the resulting overpayments.

106.    As a result of the foregoing, QMC is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 for each improper claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus three times the amount of damages which the Government sustained because of the act of that Defendant.

107. Pursuant to 31 U.S.C. § 3730, Relator is entitled to reasonable costs, expenses, and attorneys' fees incurred as a result of this action.

WHEREFORE, Relators request that the Court enter judgment against Defendant for civil penalties arising from the aforementioned violations of the False Claims Act, including the United States Government's treble damages and Relators' reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as allowed by the False Claims Act and as the Court deems just and proper.

## COUNT II
### Violation of 31 U.S.C. § 3729(a)(1)(B)
### Making False Records or Statements Material to a False or Fraudulent Claim

108. Relators re-allege and incorporate herein by reference, as though fully set forth herein, all of the above numbered paragraphs.

109. Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim with ICD-10 codes that did not accurately reflect the signs and symptoms as described on the corresponding PCR.

110. Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim representing that the patient's or authorized representative's signature was on file without confirming the same.

111. Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to government insurance programs, including but

not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim with a mileage entry of 1.0 miles despite no mileage having been entered on the corresponding PCR.

112.    Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim after having regularly waived patient obligations to pay copays or deductibles without establishing hardship or impracticability of collection in violation of the Anti-Kickback Statute.

113.    Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it submitted a claim without making reasonable effort to first obtain payment from an appropriate liability insurance, workers compensation insurance, or no-fault insurance carrier.

114.    With respect to its fraudulent records and statements, Defendant had actual knowledge of such information, acted in deliberate ignorance of the truth or falsity of such information, or acted in reckless disregard of the truth or falsity of such information.

115.    As a result of its fraudulent records and statements, Defendant has interminably received reimbursements from government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, for services not otherwise reimbursable.

116.    To the extent any of the aforementioned fraudulent records and statements is attributable to EMS, QMC is liable for such fraudulent records and statements as EMS's successor-in-interest.

117.   Additionally, to the extent any of the aforementioned fraudulent records and statements is attributable to EMS, QMC has had knowledge of such fraudulent records and statements and failed to report and reimburse the resulting overpayments.

118.   As a result of the foregoing, QMC is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 for each improper claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus three times the amount of damages which the Government sustained because of the act of that Defendant.

119.   Pursuant to 31 U.S.C. § 3730, Relator is entitled to reasonable costs, expenses, and attorneys' fees incurred as a result of this action.

WHEREFORE, Relators request that the Court enter judgment against Defendant for civil penalties arising from the aforementioned violations of the False Claims Act, including the United States Government's treble damages and Relators' reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as allowed by the False Claims Act and as the Court deems just and proper.

### COUNT III
### Violation of 31 U.S.C. § 3729(a)(1)(G)
### "Reverse" False Claims

120.   Relators re-allege and incorporate herein by reference, as though fully set forth herein, all of the above numbered paragraphs.

121.   Defendant knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, each time it failed to report or refund an overpayment

resulting from a reimbursement received from such programs in response to improperly submitted claims.

122.    With respect to its fraudulent failures to refund overpayments from government insurance programs, Defendant had actual knowledge of its obligation to repay, acted in deliberate ignorance of its obligation to repay, or acted in reckless disregard of its obligation to repay.

123.    To the extent any of the aforementioned fraudulent records, statements, or unrefunded overpayments is attributable to EMS, QMC is liable for such fraudulent records, statements, or unrefunded overpayments as EMS's successor-in-interest.

124.    Additionally, to the extent any of the aforementioned fraudulent records, statements, or unrefunded overpayments is attributable to EMS, QMC has had knowledge of such fraudulent records, statements, or unrefunded overpayments and failed to report and reimburse the resulting overpayments.

125.    As a result of the foregoing, QMC is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 for each unreimbursed overpayment, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus three times the amount of damages which the Government sustained because of the act of that Defendant.

126.    Pursuant to 31 U.S.C. § 3730, Relators are entitled to reasonable costs, expenses, and attorneys' fees incurred as a result of this action.

WHEREFORE, Relators request that the Court enter judgment against Defendant for civil penalties arising from the aforementioned violations of the False Claims Act, including the United States Government's treble damages and Relators' reasonable attorneys' fees and costs incurred

herein, for pre- and post-judgment interest as allowed by law; and for such other and further legal and equitable relief as allowed by the False Claims Act and as the Court deems just and proper.

### COUNT IV
### Violation of 31 U.S.C. § 3730(h)(1)
### Retaliation (on behalf of both Relators)

127.    Relators re-allege and incorporates herein by reference as though fully set forth herein, all of the above numbered paragraphs.

128.    By auditing claims submitted by QMC and/or EMS to government insurance programs, including but not limited to Medicare, Medicaid, and/or the VA, and submitting their findings to QMC, Relators opposed fraud that could reasonably lead to a False Claim Act action and therefore engaged in protected activity.

129.    By preventing Benne from doing her job, QMC subjected Benne to treatment that made her work intolerable.

130.    Benne's engagement in a protected activity was at least a motivating factor for the intolerable treatment to which Benne was subjected.

131.    QMC's conduct was directed toward forcing Benne to quit.

132.    QMC failed to take prompt and remedial action to correct the intolerable treatment to which Benne was subjected.

133.    Benne's decision to terminate her employment was a reasonably foreseeable consequence of QMC's conduct.

134.    The conduct to which QMC subjected Benne was such that a reasonable person in her situation would find it intolerable and find that resignation was the only reasonable alternative.

135.    Additionally, QMC terminated Hynes's employment.

136.    Hynes's engagement in a protected activity was at least a motivating factor in QMC's decision to terminate Hynes's employment.

137.    At all times mentioned herein, before and after, the above-described perpetrators were agents, servants, and employees of QMC, and were at all times acting within the scope and course of their agency and employment, and/or their actions were expressly authorized by QMC, thus making QMC liable for said actions under the doctrine of *respondeat superior*.

138.    QMC failed to make good faith efforts to establish and enforce policies to prevent illegal retaliation under the False Claims Act.

139.    QMC failed to properly train or otherwise inform their supervisors and employees concerning their duties and obligations under the civil rights laws, including the False Claims Act.

140.    As shown by the foregoing, as a result of Relators' good faith report(s) of, and opposition to, potential fraud, Relators suffered intentional retaliation at the hands of QMC based on their protected activity in violation of the False Claims Act.

141.    As a direct and proximate result of QMC's actions and/or omissions, Relators have been deprived of income as well as other monetary and non-monetary benefits.

142.    As a further direct and proximate result of QMC's actions and/or omissions, Relators have suffered humiliation, mental anguish, pain, and a loss of self-esteem in the form of garden variety emotional distress and relate compensatory damages.

143.    Relators are entitled to recover reasonable attorneys' fees from QMC as provided in 31 U.S.C. § 3730(h)(2).

WHEREFORE, Relators request that the Court enter judgement in their favor and against Defendant QMC for economic damages, including but not limited to back-pay and lost benefits; for liquidated damages; for compensatory damages, including but not limited to garden variety

emotional distress; for equitable relief, including but not limited to front-pay and injunctive relief; for reasonable attorneys' fees and costs incurred herein; for pre- and post-judgement interest as allowed by law; and for such other and further legal and equitable relief as the Court deems just and proper.

### Demand for Jury Trial and Designation of Place of Trial

Relator requests a trial by jury in the United States District Court for the District of Nebraska on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully Submitted,

CORNERSTONE LAW FIRM

By: _/s/ Joshua P. Wunderlich_
    Joshua P. Wunderlich NE BAR 24769
    j.wunderlich@cornerstonefirm.com
    5821 NW 72nd St.
    Kansas City, Missouri 64151
    Telephone      (816) 581-4040
    Facsimile      (816) 741-8889

    ATTORNEY FOR RELATORS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this ___29th___ day of ___October___, ___2021___, a true and

correct copy of the foregoing *Complaint for Damages*, along with a true and correct copy of

Relators' *Disclosure Statement*, was served via certified mail addressed to:

United States Attorney's Office
1620 Dodge St, Suite 1400
Omaha NE 68102

*and*

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

      /s/ Joshua P. Wunderlich
      Attorney for Relators

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America ex rel Pamela Benne and Toni Hynes

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Joshua P. Wunderlich, Esq.
Cornerstone Law Firm
5821 NW 72nd Street

## DEFENDANTS

Quick Med Claims, LLC

County of Residence of First Listed Defendant **Douglas County**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| [X] 1 | U.S. Government Plaintiff | |
| [ ] 2 | U.S. Government Defendant | |
| [ ] 3 | Federal Question *(U.S. Government Not a Party)* | |
| [ ] 4 | Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ]1 | [ ]1 | Incorporated *or* Principal Place of Business In This State | [ ]4 | [ ]4 |
| Citizen of Another State | [ ]2 | [ ]2 | Incorporated *and* Principal Place of Business In Another State | [ ]5 | [ ]5 |
| Citizen or Subject of a Foreign Country | [ ]3 | [ ]3 | Foreign Nation | [ ]6 | [ ]6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [X] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | **PERSONAL INJURY** | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 365 Personal Injury - Product Liability | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 370 Other Fraud | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 371 Truth in Lending | **LABOR** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 380 Other Personal Property Damage | [ ] 710 Fair Labor Standards Act | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Management Relations | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 751 Family and Medical Leave Act | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 790 Other Labor Litigation | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | [ ] 791 Employee Retirement Income Security Act | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | **SOCIAL SECURITY** | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | [ ] 861 HIA (1395ff) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 862 Black Lung (923) | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 863 DIWC/DIWW (405(g)) | |
| | | [ ] 550 Civil Rights | [ ] 864 SSID Title XVI | |
| | | [ ] 555 Prison Condition | [ ] 865 RSI (405(g)) | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS** | |
| | | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

[X] 1 Original Proceeding   [ ] 2 Removed from State Court   [ ] 3 Remanded from Appellate Court   [ ] 4 Reinstated or Reopened   [ ] 5 Transferred from Another District *(specify)*   [ ] 6 Multidistrict Litigation - Transfer   [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. §§ 3729 et seq.
Brief description of cause:
Relators seek to recover damages arising from Defendant's violations of the False Claims Act.

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.    DEMAND $ _____    CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE 10/29/21    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____



**CORNERSTONE**
LAW FIRM

October 29, 2021

**RECEIVED**

NOV 0 1 2021

CLERK
**U.S. DISTRICT COURT**

Civil Court Clerk
Roman L. Hruska Federal Courthouse
111 South 18th Plaza, Suite 1152
Omaha, Nebraska 68102

*Sent Via Certified United States Mail*

 **Re: UNITED STATES OF AMERICA** *ex rel.* **PAMELA BENNE and TONI HYNES v.
QUICK MED CLAIMS, LLC**

Dear Clerk,

 Enclosed in this letter you will find a Qui Tam Complaint for Damages to be filed Under Seal.
Also enclosed is a Civil Cover Sheet and a check in the amount of $402.00 for filing fees.

 If you have any questions regarding this correspondence, please feel free to contact our office
at (816) 581-4040. Thank you!

Sincerely,

Sydney A. Rich
Paralegal

Enclosures/

Cc: M. Katherine Paulus, Esq. & Joshua P. Wunderlich, Esq.

CORNERSTONE LAW FIRM
5821 NW 72nd STREET
KANSAS CITY, MO 64151

CERTIFIED MAIL

7021 1970 0000 4730 6294



UNITED STATES POSTAGE
PITNEY BOWES

02 1P        $008.62⁰
0000641957  OCT 29 2021
MAILED FROM ZIP CODE 64151

**Civil Court Clerk**
**Roman L. Hruska Federal**
**Courthouse**
111 South 18ᵗʰ Plaza, Suite 1152
Omaha, NE 68102



RECEIVED

NOV 0 1 2021

CLERK
U.S. DISTRICT COURT



UNITED STATES POSTAL SERVICE®

**CERTIFIED MAIL**®
FOR USE ONLY WITH IMpb SHIPPING LABEL